UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No.: 00-CV-11623 RWZ

MARINA BAY REALTY TRUST LLC,
NEPONSET CIRCLE SKILLED NURSING
AND REHABILITATION CENTER II, INC. and
GORDON DEVELOPMENT GROUP, INC.

    Plaintiffs,

    v.

UNITED STATES OF AMERICA and
UNITED STATES DEPARTMENT OF
DEFENSE, DEPARTMENT OF THE NAVY,

    Defendants.

**PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION
PURSUANT TO RULE 52(c)**

### Introduction

Plaintiffs Marina Bay Realty Trust LLC, Neponset Circle Skilled Nursing and Rehabilitation

Center II, Inc. and Gordon Development Group, Inc. (together, *"Marina Bay")* hereby oppose the

pending motion of defendant United States of America (the *"Government"*) for judgment on partial

findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure (*"Motion"*).[1]   The

Government incorrectly urges this Court to conclude that even if it violated the Massachusetts Oil

and Hazardous Material Release Prevention Act, G.L. c. 21E (*"Chapter 21E"*), in contaminating

the 3.8 acre site in question (the *"Site"*), its conduct was neither "negligent" nor "wrongful" within

the meaning of the Federal Tort Claims Act, 28 U. S. Code §§ 1346(b)(1), 2671 - 80 (the *"FTCA"*),

thus precluding  Marina Bay's recovery of the damages it incurred in discovering and cleaning up

what the Government left behind. **Motion** at 9 - 12. In so arguing, however, the Government fails

to analyze the authorities interpreting the term "wrongful." Instead – stubbornly seeking to limit this

Court's attention solely to the words "negligent" and "wrongful" themselves – the Government

ignores convincing *indicia* that for the FTCA's purposes, "wrongful" actions  encompass statutory

violations like those embodied in Chapter 21E.

---

1 Defendant United States of America's FRCP 52(c) Motion for Judgment on Partial Findings dated
January 9, 2004.

## Argument

**Point 1.** *The Motion is inadequate under Rule 52(c).*

Rule 52(c) provides that this Court may grant judgment only if the "non-moving party has failed to make out a prima facie case, or if the court determines that a preponderance of the evidence goes against the non-moving party's claims." *In re Sheehan*, 243 B.R. 590, 594 (Bankr. D. R.I. 1999). Moreover, this Court "is not obliged to rule on a Rule 52(c) motion and may instead defer entering judgment until all of the evidence has been presented." *United States v. David*, 20 F. Supp.2d 326, 331 (D. R.I. 1998); *accord, Halpin v. Atkinson-Kiewit*, 894 F. Supp. 486, 494 (D. Mass. 1995) (Rule 52(c) "permits the court to decline to render any judgment until the close of all the evidence"). Under Rule 52(c)'s predecessor, Rule 41(b), it was well established that motions for judgment in the First Circuit "will not be granted unless it is manifestly clear that plaintiff will not prove his case." *Poultry Processing, Inc. v. Old Orchard Ocean Pier Co.*, 780 F. Supp. 846, 849 (D. Me. 1991) (noting "[m]otions under Rule 41(b), the precursor to Rule 52(c), have not been favored in this circuit and dismissal under this rule should be granted 'sparingly'"). (*citations omitted*)

At this juncture, <u>before</u> this Court has heard the evidence of Marina Bay's final witness – Dr. Warren Rogers, **Motion** at 7, possibly the leading United States expert on underground storage tank (*"UST"*) corrosion, who is expected to testify that the Government caused the contamination in question – Marina Bay has not yet had the opportunity to establish "a prima facie case." And the Government's speculation that it will be able to discredit this next-to-be-called witness – "Dr. Rogers' opinion that the tank failed within three years is simply not credible," **Motion** at 8 – is manifestly inadequate under Rule 52(c)'s "preponderance of the evidence" test, particularly as it is applied in the First Circuit.

For example, Frederick B. Killmar, one of the two UST experts retained by the Government,[2]

---

2 The Government stated: "Mr. Killmar is a Rule 26(a)(2) Expert Witness. He is an expert on the standard of care and accepted practices for installation, use, and maintenance of underground storage tanks in the 1940s and 1950s and is expected to testify that the United States actions relating to fuel

testified during his October 30, 2002 deposition that he had based his opinion regarding the date of failure of the 3,000-gallon bare steel UST under consideration,[3] on a 19<u>86</u> estimate of the Steel Tank Institute, hardly a disinterested observer ... which in turn relied on figures Mr. Killmar "[did] not know." **Exhibit A** at 76.  In contrast, Mr. Killmar specifically identified Dr. Rogers as knowledgeable in this area, stating that Dr. Rogers' firm had performed "a number of" UST failure analyses. **Exhibit A** at 45. Mr. Killmar's opinion in this respect – grounded on an eighteen-year-old, third-party estimate employing unknown facts – does not represent, under any conceivable test, a "preponderance of the evidence" over Dr. Rogers' opinion. Relying on his own firm's long experience, current knowledge and ongoing assignments regarding the useful lives of USTs – all as applied to the facts of this case – Dr. Rogers has opined that the UST was leaking by 1951, three years after the Government installed it and five years <u>before</u> the Government's 1956 sale of the Site.[4]

> **Point 2.** *The Government's violation of Chapter 21E is a "wrongful act or omission" falling within the FTCA.*

The Motion is further predicated on the assumption that Marina Bay's evidence will be insufficient to establish the Government's "negligence" during its contamination of the Site.  Even if Marina Bay does not establish the Government's negligence in placing contaminated fill at the Site and installing a UST that leaked within three years, its Chapter 21E claim is nonetheless cognizable as a "wrongful act or omission" under the FTCA.

Through the FTCA the Government has waived sovereign immunity for claims arising from its "negligent or wrongful act[s] or omission[s]." 28 U.S. Code §1346(b)(1). The variety of claims

---

storage USTs in the vicinity of former Hanger Building 115 complied with the applicable standard of care and accepted practices." Joint Trial Memorandum dated December 20, 2002 at 49.

3 Opinion of Frederick B. Killmar dated August 28, 2002, Government Trial Exhibit 68, at 6 - 7.

4 Dr. Davis Ford, the Government's other UST expert, did not render an opinion on the date of failure of the 3,000-gallon UST. Opinion of Davis L. Ford, Ph.D., dated September 10, 2002, Government Trial Exhibit 67.

that may be embraced by the term "wrongful act or omission" has not been finally established by the federal courts. *See* L. Jayson & R. Longstreth, *Handling Federal Tort Claims* §9.05[4] (2003) ("The breadth and scope of the word 'wrongful' has not been definitively explored by the decisions"). Marina Bay is unaware of <u>any</u> controlling interpretation – and the Government has suggested none – either limiting the term "wrongful act" to any list of specified torts or excluding statutory torts[5] like those embodied in Chapter 21E.

The United States Supreme Court has spoken to the level of culpability required under the FTCA on only two occasions, in both instances holding that the FTCA does not cover claims for <u>strict liability</u>. *See Laird v. Nelms*, 406 U.S. 797 (1972) (damages resulting from sonic booms from military aircraft not actionable on strict or absolute liability theory); *Dalehite v. United States*, 346 U.S. 15 (1953) (damages from explosion not recoverable on theory where liability automatically imposed from decision to engage in dangerous activity). These decisions recognized that the term "wrongful act" is not equivalent to negligence, and at the same time found that the FTCA requires "misfeasance or nonfeasance" of some sort. *See Dalehite*, 346 U.S. at 45 ("the [FTCA] does require some brand of misfeasance or nonfeasance"); *Laird*, 406 U.S. at 799 (the FTCA "precludes the imposition of liability if there has been no negligence or other form of 'misfeasance or nonfeasance' on the part of the Government") (*citation omitted*; *quoting Dalehite*). The two Supreme Court pronouncements defining the outer boundaries of "negligent or wrongful act or omission" encompass claims under Chapter 21E.

Chapter 21E may in some instances attach liability without a finding of negligence, but it is <u>not</u>, as applied to claims against <u>former</u> owners of contaminated property, a strict liability statute. The Supreme Judicial Court has ruled that when applied to <u>former</u> owners of real property, Chapter 21E requires a finding that the former owner <u>actually caused</u>, through his acts or omissions, the

---

5 In *Oliveira v. Pereira*, 414 Mass. 66, 72 (1992), the Supreme Judicial Court held: "The statute, read as a whole, suggests that the essential nature of claims under Mass. Gen. L. c. 21E sounds in tort." *Id.* at 72-73. *Compare Wellesley Hills Realty Trust v. Mobil Oil Corporation*, 747 F. Supp. 93, 99 (D. Mass. 1990).

contamination.    In *Griffith v. New England  Tel. & Tel. Co.*, 420 Mass. 365, 369 (1995), the

Supreme Judicial Court stated that "only present owners or operators are strictly liable where there

has been a release of oil or hazardous material on their property."[6] Similarly, in *Marenghi v. Mobil*

*Oil Corp.*, 416 Mass. 643, 647 (1993), a case considering the liability of a site's past owner, the

Supreme Judicial Court held: "[P]roof of causation, not site ownership, is needed to impose liability

under Mass. Gen. L. c. 21E, §5(a)(5)."[7]  Most recently, in *American Fiber & Finishing v. Tyco*

*Healthcare*, 273 F. Supp.2d 155, 161 (D. Mass. July 28, 2003, O'Toole, J.), this Court construed

*Griffith* and *Marenghi* as follows:

> [L]iability [under Chapter 21E, § 5(a)(5)] is not based on the defendant's *status* as
> the owner and custodian of the Site. Rather, the plaintiff must present evidence that
> defendant somehow caused the release – that is, that the release occurred as the result
> of <u>something the defendant did or omitted to do.</u>

(*underlining added*) Actually <u>causing</u> environmental contamination – <u>not</u> merely owning or being

present on property when it occurs – does not constitute "strict liability." In the words of *Dalehite*,

such conduct is "some brand of misfeasance or nonfeasance" establishing liability under the FTCA.

The FTCA's legislative history confirms that  <u>causing</u> environmental contamination

constitutes a "wrongful act" under the FTCA.  In *Dalehite* the Supreme Court majority opinion

concluded from the FTCA's legislative history only that the tort of trespass might have been the

"inspiration" for the "wrongful act" language; it did not construe "wrongful act" as synonymous

with trespass. 346 U.S. at 45.  As the court noted in *In re Bomb Disaster at Roseville, California*,

438 F. Supp. 769, 778 (E.D. Cal. 1973): "[T]he judiciary has generally ruled that the word

---

6 The Supreme Judicial Court has also ruled that proof of contamination occurring  when the defendant
owned the property, without more,  is <u>not</u> enough to establish "cause." *Griffith,* 414 Mass. at 830.
(holding  that the affected areas "had been contaminated by oil and [gasoline] that [the defendant] had
brought onto the property"... did not establish that [the defendant] "caused" the release or a threat of a
release of oil from the site).

7.*See also, John Beaudette, Inc. v. J.P. Noonan Transp., Inc.*, 419 Mass. 311, 314 (1995), in
which the Supreme Judicial Court ruled:  "A defendant can [only] be held liable under §5(a)(5)
if it is found to have 'caused' a release of oil at the site," holding that a plaintiff must show some
causal relationship between the release for which the defendant is responsible and the response
costs.

'wrongful' was intended to include more than just negligent acts. Courts have found trespass, conversion, waste, and duress to be wrongful acts within the meaning of the FTCA."[8] The FTCA's legislative history does not indicate that "wrongful act" was included in the FTCA with the purpose of allowing claims for trespass only. *See Roseville,* 438 F. Supp. at 778, 781 (finding that the FTCA's legislative history indicates "that a trespass is only illustrative of the types of non-negligent torts, other than those enumerated, which were believed to be encompassed by the FTCA;" and defining "wrongful acts" as encompassing "[a]ny act which in the ordinary course will infringe upon the rights of another to his damage").

The legislative committees that recommended passage of the FTCA in 1946 stated: "The present bill would establish a uniform system . . . permitting suit to be brought on any tort claim with the exception of certain classes of torts expressly exempted from the operation of the act." H.R.Rep. No. 1287, 79th Cong., 1st Sess. 3; S. Rep. No. 1400, 79th Cong., 2d Sess. 31 (quoted in *Laird,* 406 U.S. at 807 (Stewart, J. and Brennan, J., dissenting)). Justices Stewart and Brennan stated:

> A bill passed by the Senate in 1942 covered only actions based on the "negligence" of Government employees. S.2221, 77[th] Cong. 2d Sess. The House committee substituted the phrase "negligent or wrongful act or omission" saying that the "committee prefers its language as it would afford relief for certain acts or omissions which may be wrongful but not necessarily negligent." H.R. Rep. No. 2245, 77[th] Cong., 2d Sess, 11. The language used by the House committee was carried over into the bill finally enacted in 1946, without further mention in the committee reports of the intended scope of the words "wrongful act."

406 U.S. at 807 n.4 (*underlining added*).

Avoiding, as it must, any interpretation of the term "wrongful act or omission," as well as the Supreme Judicial Court's limited application of Chapter 21E to former site owners, the Government inaccurately contends that "imposing the more stringent requirement that a claimant prove that the release was 'negligent or wrongful' will defeat the purpose" of Chapter 21E. **Motion at 10**. This Court does not, of course, have the power to construe Chapter 21E in a manner at odds

---

8 *See, for example, Hatahley v. United States*, 351 U.S. 173 (1955); *Alliance Assurance Co. v. United States*, 252 F.2d 529 (2nd Cir. 1958); *Aleutco Corp. v. United States*, 244 F.2d 762 (3rd Cir. 1957); *Merritt v. United States*, 332 F.2d 397 (1st Cir. 1964); *United States v. Ein Chemical Corp.*, 161 F. Supp. 238 (D.C. N.Y. 1958).

with Massachusetts courts – and Marina Bay is not asking it to do so. Instead of trying to impose a new prerequisite to culpability under Chapter 21E, Marina Bay is simply asking that this Court find that a violation of Chapter 21E by a former property owner – which already presumes a finding that the owner <u>caused</u> the release of contaminants – amounts to a "wrongful act or omission" for purposes of the FTCA. That holding would do nothing to alter the current construction and application of Chapter 21E.

Placing the Government, in its capacity as a former property owner, in the same position as private parties regarding claims under Chapter 21E, is not only consistent with Massachusetts law, but also comports with current federal environmental policy. By Executive Order 12088 dated October 13, 1978,[9] President Carter directed:

> The head of each Executive agency is responsible for ensuring that all necessary actions are taken for the prevention, control, and abatement of environmental pollution with respect to Federal facilities and activities under the control of the agency.

The Executive Order, although it does not create a separate cause of action against federal agencies, goes on to provide that federal agencies must comply with "applicable pollution control standards" – that is, the "same substantive, procedural, and other requirements that would apply to a private person."

It is immaterial to  to this Court's analysis that Chapter 21E did not exist when the FTCA was passed in 1946. The FTCA does not limit the Government's liability to legal theories or causes of action that preexisted its enactment. The implementation of any such limitation would artificially freeze the FTCA as of 1946 and would require today's litigants to disregard more than fifty years of legal development ... both absurd consequences. "Wrongful" conduct  is not a static concept. If the half-century old FTCA were given such a rigid and narrow construction, over time it would become antiquated and obsolete. The FTCA, consistent with its express limitations and exceptions, was clearly  a flexible avenue for recovery that reflects the law's changing nature.

---

9 Executive Order 12088 dated October 13, 1978. 43 Federal Register 47707, 3 C.F. R., 1987 Comp., p. 243.

The Second Circuit recently reiterated this principle in *Devlin v. United States*, 2003 WL 22928872, – F.3d – (2nd Cir. December 12, 2003), where the district court had granted summary judgment in favor of the government, ruling that the plaintiff's claim for lost insurance proceeds did not qualify as an "injury or loss of property," one of the conditions to a successful FTCA claim. FTCA § 1346(b)(1). *Id.* at *2. The Second Circuit stated:

> [T]he FTCA's basic thrust was decidedly not to create a federal common law of torts, but rather – as expressed in the final clause of section 1346(b)(1) and in section 2674 – to tie the government's liability – albeit subject to a host of qualifications – to the disparate and always evolving tort law of the several states. ... It would be antithetical to the FTCA's structure if each term in section 1346(b)(1), such as "cause" and "negligent," were given a uniform federal meaning, thereby requiring plaintiffs to satisfy a layer of federal tort law requirements in addition to satisfying those of the law of the relevant state.

Id. at *5. The Second Circuit vacated the district court's decision and remanded the case for further proceedings, including a determination as to whether the plaintiff has suffered "injury or loss of property" under Connecticut law as currently interpreted. In this case, the Government's conduct in releasing contamination at the Site is now actionable – "wrongful" – within the meaning of Chapter 21E, a statutory tort, and thus constitutes the proper basis for a claim under the FTCA.

## Conclusion

Marina Bay recognizes that the Government is shielded from suit except in instances when it has "unequivocally expressed" a waiver of sovereign immunity in controlling statutory text. *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95 (1990). Waivers of sovereign immunity must be "construed strictly in favor of the sovereign," *McMahon v. United States*, 342 U.S. 25, 27 (1951), moreover, and not "enlarge[d] ... beyond what the language requires." *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 685 (1983).

But this Court should be further guided by the principle confirmed in *Block v. Neal*, 460 U.S. 289, 298 (1983), that ...

> 'The exemption of the sovereign from suit involves hardship enough where consent has been withheld. We are not to add to its rigor by refinement of construction where consent has been announced.' *United States v. Aetna Surety Co.*, 338 U.S. 366, 383 (1949), quoting *Anderson v. Hayes Constr. Co.*, 243 N.Y. 140, 147, 153 N.E. 28, 29-30 (1926) (Cardozo, J.).

Similarly, in *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955), the Supreme Court ruled

that it should not "as a self-constituted guardian of the Treasury import immunity back into a statute

designed to limit it."

    For the above reasons, Marina Bay respectfully requests that this Court deny the Motion.

Dated: January 21, 2004

                           Respectfully submitted,

                           Marina Bay Realty Trust LLC,
                           Neponset Circle Skilled Nursing and
                           Rehabilitation Center II, Inc. and Gordon
                           Development, Inc.

                           By their attorneys,

                           _____
                           William A. DeVasher, Jr.
                              BBO Nº 552010
                           Michael B. Cosentino
                              BBO Nº 558036
                           Molly Cochran
                              BBO Nº 551833
                           Seegel, Lipshutz & Wilchins, P.C.
                           Wellesley Office Park
                           60 William Street, Suite 200
                           Wellesley, Massachusetts 02481
                              Tel: 781.237.4400
                              Fax: 781.235.2333

### Certificate of Service

    I, William A. DeVasher, Jr., hereby certify that I served a true copy of the foregoing Plaintiffs' Opposition to Defendant's Motion Pursuant to Rule 52(c) on Henry T. Miller, Esq., Trial Attorney, and Theodore L. Hunt, Esq., Trial Attorney, Environmental Torts Branch – Civil Division, U.S. Department of Justice, 1331 Pennsylvania Avenue, NW, Room 8006-S, Washington, D.C. 20004, counsel for the Government in this matter, by telefax and by first class mail, all postage prepaid, on January 21, 2004.

                           _____
                           William A. DeVasher, Jr.

F:\4 MarinaBayLitigation\3 Opposition to Rule 52(c) Motion (January 21'04)\Opposition to Rule 52(c) Motion #5 (Jan21 '04).wpd

*EXHIBIT A*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MARINA BAY REALTY TRUST )
LLC and NEPONSET CIRCLE )
SKILLED NURSING AND )
REHABILITATION CENTER, )
INC., )
)
        Plaintiffs )
)
 vs. )     Case No. 00-CV-11623 RWZ
)
UNITED STATES OF AMERICA )
and UNITED STATES )
DEPARTMENT OF DEFENSE, )
DEPARTMENT OF THE NAVY, )
)
        Defendants )

COPY

Deposition via telephone of **FREDERICK B. KILLMAR**, taken by counsel for Plaintiff on the 30th day of October, 2002, in the offices of the United States Attorney, 100 Bull Street, Savannah, Georgia, beginning at 9:50 a.m.

APPEARANCES:

For the Plaintiffs:

**WILLIAM A. DEVASHER**
Seegel Lipshutz
& Wilchins, P.C.
60 William Street, #200
Wellesley, MA 02481

For Defendants:

**HENRY T. MILLER**
U.S. Department of Justice
1331 Pennsylvania Ave., NW
Room 8006-S
Washington, D.C. 20004

**DRAKE REPORTING, P.C.**
**P.O. BOX 30574**
**SAVANNAH, GEORGIA 31410**
**(912) 897-3936**
**FAX (912) 897-3778**

44

1      Q    And that's something that a corrosion

2    engineer could determine by doing a test of the soil

3    and groundwater?

4      A    I don't know if corrosion engineers

5    typically would, you know, sink a well at a potential

6    tank site and sample the groundwater and then perform

7    tests to determine whether it's saline or not.  A

8    corrosion engineer typically takes soil samples and

9    makes resistivity measurements and has tests performed

10   to determine the presence of sulfides and stuff.

11     Q    And what's the significance of sulfides in

12   the soil?

13     A    It -- that's a good question.  I should

14   know.  I haven't thought about that for years, but I

15   know it's one of the -- it is one of the factors that

16   determines whether -- whether -- or how highly

17   corrosive an area is.

18     Q    And what about placing a tank in tidally-

19   influenced water, does that have any effect on the

20   corrosion of that tank?

21     A    It's -- well, if the tank is in water, it's

22   in water whether it's tidally-influenced or not.  So I

23   don't really think there would be.  And in the spirit

24   of being responsive to a previous question, you asked

25   if I knew of other studies that were conducted

WORD INDEX

EXHIBITS

45

1    determining how tanks failed and such.

2        Q    Yes.

3        A    I can't remember the exact question, and

4    again, I'm not trying to be overly responsive, but

5    both while I was with the American Petroleum Institute

6    and after I left API, there were studies conducted on

7    the cause of failures of underground tanks.  One study

8    was conducted in Canada by an organization called the

9    -- called PACE, the Petroleum Association for the

10   Conservation of the Canadian Environment, and some of

11   that information was then also used in an API study

12   that was conducted by a company by the name of Warren

13   Rogers (phonetic) Associates, and API produced a

14   report on that -- on that particular effort.  And I am

15   aware that Dr. Rogers has produced a number of --

16   well, I don't know if I should call them speeches or

17   presentations, that talk about the failure of tanks

18   and such.

19       Q    And is he giving those speeches even as we

20   speak?  I mean is he still an active speechmaker?

21       A    I, to be honest with you, I don't know.  I

22   haven't talked to Dr. Rogers in a couple of years.

23       Q    Do you know when the petroleum -- the what

24   you refer to as the PACE document was published?

25       A    PACE --

E
X
H
I
B
I
T
S

46

1    Q    Yeah --

2    A    -- published --

3    Q    -- a document?

4    A    PACE published a document prior to my

5  leaving API, which was in 1981, and then some of their

6  data was then used along with information developed

7  through an API study, and then that was published, and

8  I believe that was published after I left API.  So it

9  was published in '82 or '83.

10    Q    That was an API study, you said?

11    A    That's correct.  Using new information along

12  with information developed through PACE.

13    Q    And so I guess, then, a third study, if

14  that's a right term, would be when Mr. Roger -- or Dr.

15  Rogers has done; is that fair to say?

16    A    Yes.  And I don't know if I can call it a

17  study, because he -- he has done work under contract

18  with various companies.  So I don't know if he has

19  independent studies or exactly how he, you know, has

20  obtained some of the information and what he is --

21  what he has -- has released in the form of reports or

22  presentations.

23    Q    Do you know where Dr. Rogers' office is?

24    A    It's in Rhode Island.

25        MR. MILLER:  Bill, it's about 11:00.  Is

E
X
H
I
B
I
T
S

47

1    this a good time to take a little break?

2                MR. DEVASHER:   Sure.

3                (NOTE:  Off the record.  Short recess.)

4        Q    Mr. Killmar, I believe that underground

5    storage tank Number 1 was strapped down to a piece of

6    concrete; is that correct?

7        A    It -- I don't know if it was strapped to a

8    piece of concrete.  I know that it was -- it was held

9    down to prevent its flotation.

10       Q    Well, I'm reading on from Page 6, the second

11   paragraph from the end.  I'll just read the last

12   sentence in that paragraph.  It says, in referring to

13   that tank, it says:  (Reading)  It was strapped on a

14   concrete mat to prevent tank flotation --

15       A    Yes.

16       Q    -- in high water table conditions.

17       A    Yes.

18       Q    So you concluded that it was strapped to a

19   concrete mat?

20       A    I -- I believe that's how it is noted on the

21   plans.

22       Q    Do you have any reason to believe that that

23   notation is incorrect?

24       A    No.

25       Q    And would the fact that it was strapped on a

W
O
R
D

I
N
D
E
X

E
X
H
I
B
I
T
S

75

1    Q    Well, between 1948 and 1986, had there been

2    any change in the recommended protection for

3    underground storage tanks?

4        MR. MILLER:  For -- I'm sorry, Bill -- what

5    years?

6    Q    Between, well, the time this tank was

7    installed in '48, and 1986, when the testimony was

8    given, had there been any change in the industry-

9    recommended practice for the protection of underground

10   storage tanks?

11   A    It would depend on -- on the practice.  I

12   don't know exactly what you're referring to.  If

13   you're talking about a recommended practice, such as

14   an API-recommended practice?

15   Q    Yeah, that would be it.  I mean I'm thinking

16   that during that period of time, I assume, that the

17   industry, you know, got smarter about how to protect

18   these tanks from leaking and must have adopted some

19   higher degree of protection standards to stop tanks

20   from leaking.  Is that a fair statement?

21   A    Yes, and it was during the time when I was

22   with the American Petroleum Institute, from '75

23   through 1981, that these publications that API

24   produced were modified to provide tank systems that

25   would not leak or, let's say, would provide a much

W
O
R
D

I
N
D
E
X

76

1  longer leak-free life.

2      Q    With the 1986 testimony, was that referring

3  to tanks that were installed in 1986?

4      A    Yeah.  His -- the testimony was provided by

5  the Steel Tank Institute during the period when the

6  Federal Government was developing regulations that

7  would address underground storage tanks, primarily

8  those that are used at service stations and

9  convenience stores and other locations where gasoline

10 was being marketed.  And the Steel Tank Institute was

11 mentioning that they did not feel it was appropriate

12 to ban the use of unprotected steel tanks at all

13 locations.

14     Q    Do you know based on what figures the Steel

15 Tank Institute derived that average life of 17 years?

16     A    That I do not know.

17     Q    Have you ever acted as a consultant or

18 employee of the Steel Tank Institute?

19     A    No, I have not.  And may I add, I smiled,

20 because I did consult with Owens-Corning Fiberglass,

21 and the two, between Owens-Corning Fiberglass and the

22 Steel Tank Institute, we're talking about two

23 extremes, competitors.

24     Q    Oh, okay.  Because they are a fiberglass

25 against steel?

E
X
H
I
B
I
T
S

77

1      A      Exactly.

2      Q      Are you aware of any report or study by the

3   Steel Tank Institute of the average life of

4   underground storage -- bare steel underground storage

5   tanks that are installed in groundwater?

6      A      I have never seen a report that they have

7   produced, but they may have done so.

8      Q      Well, in the next paragraph of your report,

9   that's actually the next to last paragraph, the first

10  sentence says:  (Reading)  There are no documents that

11  support the claim that the United States or a third

12  party physically dumped, spilled, or disposed of

13  petroleum products at the site.  Did I read that

14  correctly?

15     A      Yes.

16     Q      Are you talking about the entire site or --

17  by "the entire site" I mean the 3.8-acre site, and I'm

18  sure you do, too -- or just the part of the site

19  that's near the underground storage tanks?

20     A      I -- I -- I think I'm talking about the

21  property that is part of this litigation, the 4-acre

22  site or whatever the actual size is, because I, again,

23  I have -- I did not see a document in all the

24  documents that were produced that shows that there was

25  any third party that dumped anything at the site or